Thank you, Your Honor. Dennis Moran representing Domori Project, DMP. I hope we're doing that way throughout the argument. DMP is appealing a number of things, but let me just start off by being very clear about what we ask for. We're not asking for a return of $7.5 million we assigned to cash to Mitsui. That's not the issue here. The issue here is the attachment and the arbitration, whether the attachment was wrongfully issued and whether the claim for wrongful attachment should be heard here or whether it should be subject to the arbitration agreement. If you no longer have any interest in the property, how can you have a claim for wrongful attachment? Because when the attachment occurred, we did have the interest. So the claim for wrongful attachment, the tort claim for wrongful attachment, the damage that was caused at that time still exists. Okay. That wasn't extinguished by giving up the $7.5 million itself because we didn't give up the claim for the damage it cost. I mean, that's a property right. It's a property right under Washington law, under everybody's law as far as I know. And DMP never gave that up. And that has significant value. And all we're asking is that we be allowed to bring that claim in the place where the tort occurred. The lawful, the second attachment was within weeks, wasn't it? Your first, your wrongful attachment claim is, look, if they knew we were here, they didn't serve us with the notice of the application for the first attachment. There were two judges. I don't recall which judge was first. And that was found to be a correct position. Your position was correct. They should have given notice. So they did give notice. And the second attachment then, which you're not challenging, is, was issued within days or a couple of weeks after the first attachment. A couple of months. But, yes, we are challenging that. What's your challenge to the second attachment? That it's a chosen action? It can't be attached? Yes. It can't be attached. Because the attachment, because the second attachment. You're saying it can't be attached, as opposed to the formalities, the hoops that the plaintiff jumped through to obtain the writ of attachment from the superior court. Well, under the superior court, or under state law, yeah. There's a distinction. I'm trying to find out what your real challenge is to that second writ of attachment. Okay. All right. The first attachment was a rule-of-the-attachment. Okay. The second attachment, they did two things. They tried a rule-of-the-attachment, and that was not granted, but they tried a state law prejudgment attachment under the state law in the federal district court. Now, if you thought that that was a, that writ was wrongfully issued by the state superior court, isn't that the place where you should have challenged it? That second attachment? You didn't challenge it, did you? We did challenge it. We challenged it in federal district court. Oh, no. The place for you to challenge that writ of attachment is where it was issued, in the state superior court. It wasn't issued in the state superior court. It was issued in the federal district court. The second writ of attachment? The second writ of attachment. Pursuant to state law. Pursuant to state law, yes. Under the federal statute. Judge Lasnik issued the attachment order, and the attachment order then is taken down to the clerk, and the clerk executes on it, and that's the state process. But the order issued in the attachment order. Okay. But you, did you then go in and say, the first attachment was wrongful, and you held for us. Now this second attachment is wrongful. We did that in the federal district court in front of Judge Kuhnhauer, who Judge Lasnik was sitting in, so they had an exchange. But your theory was that a chosen action is not subject to attachment. That's correct. That's the theory. Because the. Is there a rise or fall on that? The second attachment. Second. The second attachment rises or falls on that issue, yes. So with the Woody's Olympic Lumber case. The Woody's Olympic Lumber case is an execution case, number one. And one. They write in it that it could be either one. Well, Woody's is a court of appeals case, and they do make the distinction. Woody's recognizes the distinction between execution and garnishment and attachment. Doesn't the case say the question is whether an unliquidated tort claim is subject to attachment or execution? That's the dicta, but it is clear dicta. Because it does discuss. The court describes the issue before it. It's dicta. Because in the case, it talks about the distinction that Lundquist made. And Lundquist is absolutely clear on the distinction. Execution can get an unliquidated claim. Garnishment and attachment can't. And the difference arises because they both arise out of statutes, and the statutes are written different. Now, Woody's says that, but Woody's was an execution case. It wasn't an attachment case. They did an execution, which you do post-judgment. Attachment and garnishment are pre-judgment or post-judgment, but you can't do a pre-judgment execution. Woody's was an execution case. Woody's talks about it. Woody's doesn't say Lundquist was wrong in the distinction.  Being an appeals court, and Lundquist being a Supreme Court case, that was the appropriate way to approach it. The case that really is, I think, clarifies the issue is the Boundary Dam case. Because the Boundary Dam case, you have an assignment, an intervening assignment, you have a garnishment. And Boundary Dam is absolutely a garnishment. Okay. Because this whole wall is subject to arbitration, right? That is a threshold issue, but not a dispositive threshold issue, because I think the Court can – if the Court determines that the attachment was wrongful but still orders us to arbitrate, well, then we go back and arbitrate in London under those rules, under that order. The issue that was sent to arbitration was whether the attachment was wrongful. No. The issue sent to arbitration, it was a stay, saying we can't even bring the wrongful arrest claim because it falls within the arbitration clause. I thought as well that the – maybe I'm confused. I thought as well that the wrongful attachment claim itself was sent to arbitration. Is that wrong? No. It was never brought in arbitration. Never brought in arbitration. It was referred. I'm under the same impression that the Court sent that wrongful attachment claim to arbitration. To arbitration with the rest of the assets. We never arbitrated the claim in London. But you chose not to, but it was sent off. Right. Therefore, if it was correct, you lose. No. It was – it wasn't – it was – our case here was stayed. Okay. But the list of claims that was – It was sent off to arbitration. No. It wasn't sent off. Because the list of claims in arbitration – the arbitration in London simply dealt with the contract of affrightment and then subsequently the repudiation claim. The district court did not order you to arbitrate the wrongful – It ordered that if the claim be brought, it be brought in arbitration, and that's what we're appealing here. But we didn't bring it in arbitration. I understand. We waited for final judgment. We waited to bring it. And, therefore, the question of whether you were properly ordered was logically prior to the question – the merits question of whether – if the district court was deciding the question, would you win all moves. Because first we have to decide whether the district court should have decided it, even though what the district court thought it was doing was sending it off to  Okay.  All right. Well, let me address that then. Straight up on the arbitration issue, because that's a big issue. And I tell you, I went through these arbitration cases, and I kind of finally to try to understand where we are in this arbitration language, because so much depends on – seems to depend on the text of the arbitration phrase, how inclusive it is. So I kind of made this little diagram. And I think the cases I stacked up were the Sinula case, the Tracer research, the Armada Cole, and the Worth line, which was the district court case, Sinula and Tracer being the two Ninth Circuit cases. And I think I focused the specific language that's at issue here. The Sinula case was the broadest one, and that had the language kind of in connection with and or arising out of, whereas Tracer just had the arising out of. Now, Tracer was ruled to be fairly narrow because arising out of was narrow language. And Sinula, the in connection with the court determined, well, that's much broader language, so it's very inclusive. But let's look at how inclusive the circuit said it was. It said that it would include things like the antitrust claims and the trade secret claims, okay, which are arising out of the contract. And that makes sense. But it didn't address the issue of whether it would include these kind of post or these collection torts, which are not really directly derivative of the contract. And antitrust claim or a trade secret claim in the context of a contract dispute, that's pretty close. Tracer says it's not close enough unless you have the in connection with knowledge. But Sinula says it is if you have the, I'm sorry, Tracer, if you have the arising out of, but Sinula says it is close enough if you have the in connection with language. But neither of them say, well, if you're just going out and doing a prejudgment attachment or perpetrating a collection tort or anything like that, they're not included. Now, the Worth, let's see, the Worth line case. Kagan. What does the arbitration clause in question say about whether, who decides an arbitral case? No, it's, the arbitration clause is subject to English law, but I think all the foreign law is subject to whatever law. That's not what I'm asking you. I'm asking you sort of the, do many arbitration agreements say that arbitrability is for the arbitrator? Does this one say that? This is a classic arbitrability issue, right? Yes. It's nothing but that. It's not about new parties or anything else. It's just an arbitrability issue. The scope of the arbitration. It's subject to the arbitrator as a matter of contract, quite aside from anything else, right? Could it be sent? I don't know if the arbitrator would hear it because I don't know if the arbitrator would agree that it's within their scope. I mean, that was never done. Whether or not the contract addresses the question of who decides arbitrability, does it address that, the arbitration agreement? Directly, no. I don't think it does. But I think it may be indirectly. I mean, if you want to say it's subject to English law. Indirectly. So many agreements do have such a clause. This one does not is what you're telling me. I'm not aware of it in there, yeah. I don't think so. Maybe. I'm looking at Judge Lesnik's order from 21 May, 2001. Okay. The penultimate line of which is, Plaintiff's motion to compel arbitration of defendant's wrongful attachment claim is granted. Yes. I thought you told us that didn't happen. They made a motion to compel arbitration which is. Which is essentially it's a motion to stay the case pending arbitration. And a motion to compel arbitration. Well. That's different. And therefore, to stay the case. Oh, okay. I don't think there's a. . . I don't think it's different. But if the Court determines it's different, we're appealing. I mean, that's the order we're appealing, is whether that was a properly issued order. Judge Hawkins is saying your answer is about five minutes at the beginning or somewhat evasive. Go ahead. Well, I don't want to. . . I guess it depends on your definition of the word is. No, no. I don't want to get to that. We didn't arbitrate the case in London because, you know, we couldn't. In fact, the client could.  Well, it can't. It's blood from a stone. The client could not do it, okay? And the reason it could not do it is because all of its money was frozen here, so it couldn't pay its lawyers there. And the lawyers in London quit, so it couldn't arbitrate the case. Well, whether it was a choice compelled by economic circumstance or otherwise, the matter of the wrongful attachment was granted in terms of referring it to arbitration. And your client did not present it in arbitration, right? That's correct. Whether they couldn't, shouldn't, wouldn't, didn't, had to or whatever, they didn't. That's correct. And believe. . . And now you want us to send it back for a district court trial on that claim. Because our client believes that that order was erroneous. I think we understand our argument. You have about seven minutes left. Why don't we hear from the other side, and you can rebut to your heart's content. Thank you. Counsel? Thank you, Your Honor. Good morning. My name is Robert Baca with Kiesel, Young & Logan, and we represent Loone Path in Lavinia. I think that the Court correctly set forth in its order of August 29 that the threshold issues for this Court is to determine whether or not the appeal that DMP's counsel has attempted to bring here is moot and or DMP lacks standing to proceed with the appeal. When DMP filed its opening brief, it identified three issues on appeal, the first of which was whether or not Judge Lastick made a mistake when he signed that order of May 21 compelling arbitration. The other two were attacks upon the rulings by Judge Kuhnauer, which essentially said, yes, you get an attachment, and yes, I'm going to give all the money to you, Loone Path in Lavinia. Loone Path in Lavinia moved to dismiss the appeal after DMP filed its opening brief. Well, the last two presumably are gone because of considerable. But what about the first one? They're gone, and I think it's significant. That's a significant admission by DMP having tried to bring those. As to the third one, Your Honor, that is also gone for the simple reasons that the appeal of the arbitration order, as to that, DMP never explains how it could survive two different things, the first of which, taking them sequentially, was that by a document dated in January of 2002, DMP assigned to a different creditor, Mitsui, all of the rights. Your argument is that this was a fight over who owned that chosen action. That's not what this case is about. This is about the wrongful attachment. Let me give you my hypothetical, my dump truck hypothetical. I'm in the business of hauling sand and gravel, and you wrongfully attach my truck. And I'm out of business. I can't use my truck, but I still own it. An attachment doesn't transfer title. I still own that truck, but the sheriff has attached it, and I can't conduct my sand and gravel business. Thereafter, my dump truck, I sell it subject to the attachment, so I don't own the dump truck anymore. Your mootness argument is that the wrongful attachment action is no longer a viable claim because you don't own the dump truck anymore. That's exactly what you're arguing here, that the chosen action was divided up, was signed, and then the proceeds divided up. And, therefore, because you don't own that chosen action, you can't go back to our wrongful attachment and recover damages. That's your mootness argument. I think it's a little bit more than that, Your Honor, in the sense that we're talking about here, first, an assignment, not just of the dump truck. But of the right to sue for the wrongful attachment. Exactly, Your Honor. They did not assign the right to sue for wrongful attachment. The only thing that was attached was the chosen action, the money's owing, I forget the name of it. To the third party. Right. But this was not attached. This is different in the sense that the attachment is what gave rise to DMP's wrongful attachment claim. Subsequent. Basically, you have something going on at two different times. They have now given up the chosen action, but they haven't given up the claim that at the time it was originally attached, it was improper. Respectfully, they did, Your Honor. If you take a look at the assignment to Mitsui, it's not simply an assignment of the right to the DVMI funds. The phrase that's used is much broader than that. It goes on to say all rights and benefits. Tell us where that is. Look at it. That would be. It's in the excerpts. This was not put in by DMP. So you'd have to look at Appelli's supplemental excerpts of record. Let me find it. And the assignment itself is on page 18. That's correct, Your Honor. What page? Page 18. Okay. We're there. At the very bottom of the page, Your Honors, you'll see section 1.1 entitled The Transfer. And it says, DMP hereby unconditionally and irrevocably transfers, assigns, and conveys to Mitsui any and all of its rights to and interest in the DVMI claim. As to Judge Quackenbush's question, there's the truck. But it goes beyond that and says, as well. Just a second. Okay. The DVMI claim is defined earlier as the. Let's see. That's about the middle of the page. There was an action against Dalmore Product Vessel Net Management, Inc., currently pending for the King County Superior Court as cause number so-and-so. That's the claim, no? That's defined as the DVMI claim in this document. Okay. But it goes on to say, as well as. That's not the attachment. I'm saying that the wrongful attachment claim is a right or benefit ancillary or related to the DVMI claim. That's what I'm saying. And in addition, the fact that in the stipulation that DMP's lawyer signed, DMP expressly disclaimed any interest having anything to do with the funds, the $7.5 million that ended up being in question. We don't have any interest in the funds. That's what they're saying. They're saying that give out the money for other purposes, but we still have a cause of action in tort for the original back when wrongful attachment. I don't see how they could do that in light of this language in the transfer, Your Honor, in terms of what they gave, because they didn't stop the sentence by saying interest in the DVMI claim. The words, as well as, means, wait, there's something more. This transfer says that we're also giving any rights or benefits that are ancillary or related thereto. That's very broad language. Tell us how the DMVI, DVMI claim is ancillary to the wrongful attachment. Okay. I've actually stated the opposite, Your Honor, and that is that the wrongful attachment claim is ancillary or related to the DVMI claim itself. What's the relationship between those things? The relationship between those things is that if you didn't have the claim to begin with, you couldn't have a claim for wrongful attachment of it. And so this is essentially a quick claim of any rights or interests that we have in connection with. This language related to is extraordinarily broad. And in the context of the arbitration clause that I'm going to get to in a second. So your argument is based on the language rights or benefits ancillary or related thereto. That's right, Your Honor, as to the wrongful attachment claim. If it swallows up the wrongful attachment claim, you're good. If it doesn't, you're not. As to that issue, in addition, I think that that's laminated by what's stated in the stipulation that was filed, where DMP released and waived any and all rights that it had to the funds and any and all objections that it had to the disbursement. Well, one of the objections that would have to be there as to a disbursement is that those funds were wrongfully attached to begin with. So if this agreement that you pointed us to had to do with specifically with Judge Quackenbush's dump truck analogy, you would say that by giving up any claim to the dump truck, you've given up any this language would also swallow up the wrongful attachment. That's right. With the understanding that. Would that also be the case if you had a personal injury or property damage tort claim arising out of the operation of that dump truck? Would this language would include that tort claim also? I don't know. But the reason I think it's different, Your Honor, is that if it was the intent of the parties to waive and give up that wrongful attachment claim, it would have said that. And I just can't agree with your suggestion. But even assuming that maybe that language could be considered at a minimum, it would be ambiguous. And I just thought I can't follow your argument, Mr. Blackwell, or your suggestion that it was the intent of the parties when they divided up the dump truck to whip the monies, to give up anything that had gone on with that shows of action dump truck previously. I think the difference is there was a history with this in terms of the wrongful attachment claim having come up and with DNP trying to assert it before this assignment came about to Mitsui. We're not talking about some causes of action that were lingering in the background that nobody had in mind. Add to Judge Quackenbush's hypothetical that the person executing the writ of attachment had a representative with him or her from the creditor, and that person physically assaulted Judge Quackenbush's sand and gravel operator. Would this kind of language give up that tort claim? I think that that's more far afield from what we're talking about here. So I think that's the kind of thing that would call for more specific language, to be honest with you. I think we beat this point up. Okay. What I'd like to do if I can. You're not challenging the fact that you wrongfully, according to the court, sued out and obtained that first attachment. Well, that's not. Didn't the court find that you improperly obtained the first writ of attachment? You knew that DNP was represented here and you failed to give notice. You're not challenging that finding, right? We're not in this proceeding, Your Honor. It's slightly different than what you just described as to what happened. That's the gist of what the court found, that you failed to give notice. You knew that they were here. Ironically, it's the opposite. Rule B is a very strange item under the ad hoc rules. I'm talking about what the court found. The court found that we should have told the court that there was a former representative of DNP who was. The court made the ultimate finding. The first writ of attachment was wrongfully. And you're right. And we moved beyond that and we went under State court proceedings and got, about seven weeks later, got the second writ of attachment in Federal court under State law. That's what we did. And the. Is there in Washington law a tort, wrongful attachment that would give rise to tort damages? Yes. Their claim here, as I understand it, is because of the attachment, they were consequentially damaged in that they had no resources. Yes. I apologize. I don't have a citation for you, but I do believe there is such a cause of action in Washington. Yes. The issue I want to turn to next is if the only issue which I understand DNP is now pursuing, that being whether or not Judge Lasnik made a mistake in that May 21 order by ordering them to go to London and arbitrate their wrongful attachment claim, the start point for that is Simula, because in Simula this court explained, following the Federal Arbitration Act and Supreme Court precedent, that the terms and the scope of the arbitration clause is what governs. And so you take a look at the words that are used in the arbitration clauses that are involved here, and specifically in the contract of affraidment, which is the subject of the arbitration that my clients started against DNP in London. What's the, in your client's view, the consequence of being ordered to arbitrate this claim and not arbitrate it? I'm sorry, Your Honor. Being told, oh, to not do that, that's a waiver. That is an absolute waiver. In fact, contrary to what DNP's counsel told you, it wasn't simply a stay that we requested and obtained. It was a stay and an order saying, look, if you're going to proceed this claim, go to London and do it in arbitration, just like the arbitration clause says. Is there, what's your best case for saying that in that circumstance where a judge orders a particular issue to arbitration and one of the parties, the party having the burden of that particular issue, doesn't present evidence on it? What's your best case for saying that that prevents what they're seeking here today, that you must exhaust, if I can use the phrase, exhaust the arbitration before you can bring the court to trial? I don't know that I have authority for that proposition. I'm not arguing that. What I'm arguing is that they act at their peril when DNP decides that we disagree with what Judge Lassnick told us. And we're going to take the risk by not actively pursuing that claim in arbitration, that we're going to persuade three judges from the Ninth Circuit Court of Appeals that Judge Lassnick was wrong, so we can resurrect that claim somehow. So my point is ‑‑ Wrong in referring it to arbitration. Correct. That's right, Your Honor. So that's the risk that they've taken here. But no judgment were against them on this claim in arbitration, was there? It was never raised. Well, actually, it was ‑‑ lip service was paid to it, as was most of the counterclaims that DNP asserted in that case. And what the ‑‑ By whom? By whom? By the counsel who represented DNP in the arbitration. This was a contested arbitration. And if you look at the arbitration order itself, which is in the record, you'll find that the arbitration panel dealt pretty swiftly with DNP's counterclaims because they found that none of them had any merit. And so all of them were ruled against. And so the answer to your combined questions is that DNP has lost on that issue in the arbitration. It can never go back to the arbitration. That's done. That resulted in an award. That award has been confirmed by the district court. So the only hope that DNP has is to convince the three of you that Judge Lastnick made a mistake when he said that the wrongful attachment claim is something that's subject to arbitration itself. And in that respect, we submit that SIMULA, again, provides the formula for the Court's decision here. SIMULA dealt with an arbitration clause that was nearly identical to the ones involved here in the sense that they're very broad. The claim was sent off to arbitration pursuant to that. I'm sorry, Your Honor? What claim was sent off in SIMULA to arbitration? In SIMULA, there were a variety of claims that came up. It's not a wrongful attachment counterclaim case, Your Honor. We did cite to Your Honors those few cases that exist where the question of whether a wrongful attachment counterclaim is subject to arbitration. And in each of those cases, the courts concluded that they were and that there was certainly no reason not to have them go out to arbitration. And especially in light of the extraordinarily strong Federal policy in favor of arbitration, that's the right answer. It's interesting because these two issues overlap. That is, the settlement, the scope of the settlement and the scope of the arbitration because the language is similar in terms of related to the claim. And so one could start hypotheticals along the same line that Judge Quackenbush had given you before. And what if in the course of attaching the property, they shattered the property? Would that be within the U.S.C.? I think it's different in the sense that the language in the arbitration clause is it calls for any dispute that arises under or is in connection with the contract of a freightman. And there's a direct link that you go, okay, the next step is we invoked 9 U.S.C. Section 8, that provision in the Federal Arbitration Act that says you can come to a United States District Court and you can invoke the powers of that court to reach out and obtain security for a claim in arbitration. That's exactly what we did. The claim in arbitration was my client's claim for breach of the contract of a freightman. So the only reason for the attachment was to obtain security for breach of the contract of a freightman, which was being arbitrated under the very arbitration clause that's in question here. And so that attachment is in connection with the contract of a freightman directly by that means. But then you have to say that if the claim was that they smashed the truck while attaching it, that that would have to go to arbitration. Yes, because it's any dispute between the parties in connection with it. That's right. It's extraordinarily broad language. And remember that this Court has said in simula that any doubts have to be resolved in favor of arbitration. There's a strong federal policy, particularly in the international arena, which is what's involved here under Supreme Court precedent, that favors arbitration. The cases that DMP relies upon involve arbitration clauses that are much narrower in scope. So, for example, the Armada Cole case out of the Eleventh Circuit from 1984 involved an arbitration clause under a charter party, which called for arbitration only of disputes that arose during the term of the charter party. Well, the wrongful attachment claim was something that arose outside of that temporal limitation. And so the Court correctly concluded, no, we're not going to make you go arbitrate this wrongful attachment claim. Well, that's not what this clause says in this case. This case, we have any dispute arising in connection with the contract of a freightman. Again, there was a breach of the contract of a freightman. The arbitration was started because of that. And the attachment was made to support that arbitration. And so it's certainly in connection with it. It's the very same arbitration clause that caused the arbitration to be started in the first place. And so Judge Lasnik made no mistake when he said, I've looked at these other federal district courts' decisions that we cited where they all said there's no reason for this arbitration. We've got this strong federal policy that favors arbitration. That's where that case should go. Take your claim to arbitration.  We thank you for your argument. Thank you, Your Honor. Rubella? I'm going to ask the Court to put this in perspective, what went on here. Because the way the arbitration clause works with the prejudgment attachment is an extraordinarily dangerous creditor tool, as it was used here. Because the way it gets strung together, if the law is as suggested by Lavinia, here's what can happen. I'll just put different faces on it. If I have a promissory note with a foreign creditor with an arbitration clause in Kazakhstan, which is a treaty country, they can file the arbitration there, come here, convince a judge to get a prejudgment seizure of all of my native collection, burn my house down, commit the tort. And then when I try to sue them here, they get an order staying my claim for burning my house down and trying to get my money back pending the arbitration. So I'm forced to go to Kazakhstan with no money, do something I absolutely can't do, so I'm going to lose. And then they take the arbitration result. If your client agreed to go to arbitration in London. They agreed. In the... Well, I would have two in the note. In the contract between the parties, your client agreed in the event of disputes arising out of and arising here under, they agreed to go to London. They agreed, yes, under the contract of affrightment. If the creditor had come here and instead of seizing all their money had blown up their warehouse, they would probably be saying, you know, that's a problem in London. And if all their money was seized, then they don't have the ability to do it. You see, and the problem, here's the problem. Once the order staying the case here, the tort case here is issued, it's unappealable. It's an unappealable interlocutory order. So you have to just wait the thing out. The person who's had the tort committed... The question I'm having trouble with in your parade of horribles is this. If you had stayed in district court, you would have had to pay lawyers to stay in district court and litigate the wrongful cash complaint, right? Yes. So the fact that the money was tied up is going to be a problem either way. So all you're talking about is a plane ride to London in terms of the difficulty of litigating this? The cost of the London litigation, well, here's exactly what happened. The client didn't have any money. The client didn't have any money. They didn't pay you here either. Well, I got paid from another source. I mean, that would not have applied. It would have paid you to go to London. I'm having a hard time seeing why litigating in district court or litigating in London is a disaster. Well, it is because it was. Let me see if I can explain why. I mean, the client couldn't pay for London. They didn't. And as a result, they had all of their evidence barred in the London arbitration proceeding. Only at the last minute were they able to make financial arrangements to have an attorney actually show up at the arbitration who showed up in time to hear the arbitrators borrow all of his evidence concerning the entire $78 million contract damage claim, the accelerated claim. So they lost it. If they had money to have me go to London, and I could have figured out how to do it, they would have had money to not, you know, put on evidence in the underlying arbitration case on the contract of a freightman. Even with what happened, they were still able to convince the arbitration court that the amount of the claim was exactly what we said it was here, the $3 million. That was the claim. I mean, within a couple hundred thousand, which is what we said it was here. And what they said, it was over $7.5 million, which kind of brings me to that second issue, which is the over-arrest issue, which I think is just the court should deal with, because that is yet another creditor tool that threatens. And that's if any time a creditor can come in and get a prejudgment attachment for $1 on a million-dollar asset, and then later on acquire new claims that haven't even yet manifested, and then go back and say, now we have a million-dollar claim against that million-dollar asset, they've essentially preferenced every other creditor, and you wiped out the asset. And, in fact, like what happened here, getting the original attachment can trigger all these other claims, and that's the issue we would like to try at the district court. Now, you know, if we win and show that, yes, this arrested. Okay. Your problem is that they need – it was only because of a larger – the second claim, which was as to which there wasn't any probable cause here in the district court, that they ultimately got $8 million instead of $2.5 million on credit, something like that, right? Well, they ultimately got the whole 7.5, as opposed to the 3, yes. My numbers were off of the context, right? Sure. So the – but that's not the nature of your – that's not your awful attachment claim, as we understood it before. You told us that you were – the love of your awful attachment claim, which is chosen action, is shown for the most part, except for the first seven weeks. If the court rules that the chosen action issue fails, okay, the over-arrest issue is there next to deal with, because even if you can – you can seize the chosen action, you can only seize it for that amount, 3.5. The seizure for the difference, the additional 4.5 or whatever it was, that's wrongful because you can't retroactively seize it. And so then we try that. And that – But as to that retroactive seizure, didn't – isn't that where you did give up? You gave up the $8 million, any right to the $8 million as such. It's gone. We – we gave – again, we gave up the right to the 7.5, but not the right to the wrongful arrest of the 7 – of the difference between the 7.5. So, I mean, there is a – there's a distinction there. Anyway, I just asked the Court, the parade of horribles – the parade of horribles is real. It has happened. And the Court – this Court, its order is going to define how creditors can approach debtors. And if a creditor can use an arbitration clause along with the prejudgment attachment process to seize assets and effectively prevent a defendant from defending itself, and that's – remember, look at all the countries that are part of that – that are part of that treaty. I mean, it's – it's almost everybody. And so almost everybody can come in here and force anyone who signs on to that to go wherever they need to go. Now, that's fine in the first instance because you sign on to it. But when you couple the ability to use our seizure laws to wipe out their ability to defend in the foreign forum, you've created a really dangerous mix. And I'd ask the Court to not do that. Thank you. Thank you for your argument. Thank both sides for their argument. The case just argued will be submitted for decision.
judges: Hawkins, Berzon, Quackenbush